Argued and submitted March 7, 1991, the decision of the Court of Appeals reversed
and the judgment of the circuit court affirmed February 6, reconsideration denied
March 24, 1992

Carroll Ann ZACHER,
*Petitioner on Review,*

*v.*

William M. PETTY, M.D.,
and Gynecology Clinic, P.C.,
*Respondents on Review,*

David M. COOK, M.D.,
George Robie, M.D.,
and the State of Oregon
by and through the
Oregon Health Sciences University,
*Defendants.*

(CC A8602-00863; CA A47637; SC S37563)
826 P2d 619

Kathryn H. Clarke, Portland, argued the cause and filed the petition for petitioner on review.

Mildred J. Carmack, of Schwabe, Williamson & Wyatt, Portland, argued the cause and filed the response to the petition for respondents on review.

Douglas G. Schaller, Eugene, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

PETERSON, J.

## PETERSON, J.

This is a negligence action against a physician, Dr. Petty, and the clinic with which he was associated, Gynecological Clinic, P.C.[1] Defendant performed a total abdominal hysterectomy and bilateral salpingo-oophorectomy (TAH/BSO) on plaintiff, removing her uterus, ovaries, and fallopian tubes.

Plaintiff thereafter brought this action against defendant, claiming that removal of her uterus, ovaries, and fallopian tubes was unnecessary. The trial court submitted seven specifications of negligence to the jury, including an informed consent claim that defendant was negligent

"[i]n failing to advise and warn plaintiff of the material risks, possible consequences and complications involved in proceeding with surgery, and alternatives to such surgical treatment when defendant knew or reasonably should have known of such risks, consequences and complications of the surgical treatment and the alternatives thereto."

The jury returned a general verdict in favor of plaintiff. Defendant appealed, asserting that the trial court erred in submitting various negligence claims to the jury, including the informed consent claim.

The Court of Appeals concluded that the trial court erred in submitting the informed consent issue to the jury and reversed and remanded for a new trial. *Zacher v. Petty*, 103 Or App 8, 797 P2d 1042 (1990). Plaintiff petitioned for review, asserting that the Court of Appeals misapplied Oregon's informed consent statute, ORS 677.097. We agree that ORS 677.097 was misapplied, reverse the decision of the Court of Appeals, and affirm the judgment in favor of plaintiff.

At trial, defendant introduced evidence concerning his discussions with plaintiff about the procedure or treatment to be undertaken, the existence of alternative procedures or methods of treatment, and the risks incident to the procedure or treatment. Plaintiff presented testimony from

---

[1] Other defendants include two other physicians and the State of Oregon. The jury absolved one of the physicians, and the appeal against the other physician and the State of Oregon was dismissed. Dr. Petty and his employer will be referred to as "defendant" in this opinion.

other physicians that defendant was negligent in failing to discuss with plaintiff other available alternative methods of treatment.

After both sides rested, defendant moved to strike the informed consent allegation on the ground that there was no evidence that defendant's conduct in obtaining plaintiff's consent to the surgery was below the standard of care required by law. The trial court denied the motion and submitted the claim to the jury.

Oregon has a statute that governs physicians and podiatrists in obtaining a patient's informed consent. ORS 677.097[2] sets forth the steps that a physician shall follow in obtaining a patient's informed consent:

1. The physician must explain the procedure or treatment. The statute specifies that the explanation may be "in general terms." ORS 677.097(1)(a).

2. The physician must explain that there may be alternative procedures or methods of treatment. ORS 677.097(1)(b). If alternative procedures or methods of treatment are available, a general statement that there are alternative procedures or methods of treatment is sufficient.

3. The physician must explain that there are risks, if any, to the contemplated procedure or treatment. ORS 677.097(1)(c). If there are risks, a general statement that there are risks to the contemplated procedure or treatment will suffice.

---

[2] ORS 677.097 provides, in part:

"(1) In order to obtain the informed consent of a patient, a physician or podiatrist shall explain the following:

"(a) In general terms the procedure or treatment to be undertaken;

"(b) That there may be alternative procedures or methods of treatment, if any; and

"(c) That there are risks, if any, to the procedure or treatment.

"(2) After giving the explanation specified in subsection (1) of this section, the physician or podiatrist shall ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician or podiatrist shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so would be materially detrimental to the patient."

Those are the physician's three obligations under part (1) of the statute. Part (2) requires that at least one more thing be done.

    4.   The physician "shall ask the patient if the patient wants a more detailed explanation."

And, if the patient so requests,

    5.   The physician "shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so would be materially detrimental to the patient." If the patient does not want a more detailed explanation, or if to give one would be materially detrimental to the patient, none need be given.

    The legislature has created a statutory informed consent standard by requiring an explanation of the treatment or procedure only in general terms, and a minimal explanation of the alternatives and material risks, *if* the physician also asks the question required by part (2) of the statute and the patient answers in the negative. If the physician does not ask the question required by part (2), the physician has not complied with the statute and will be held to the disclosure required by the last sentence of part (2) (which is also the disclosure required by Oregon common law).[3] ORS 677.097 was intended to codify and clarify the common law of informed consent by spelling out the physician's obligations.[4]

---

[3] *Getchell v. Mansfield*, 260 Or 174, 183, 489 P2d 953 (1971), held that a physician intending to perform a surgical procedure should inform the patient of the material risks of the surgery and the feasible alternative courses of treatment, if the patient "can be advised of the risks and alternatives without detriment to his well-being."

[4] There is extensive legislative history concerning ORS 677.097 that makes it clear that the legislature intended to codify the informed consent law. Late in the legislative process, following hearings and tabling and untabling of the bill, a series of amendments were proposed jointly "by the odd combination of the Oregon Medical Association and the Oregon Trial Lawyers Association." Senator Carson described this "unusual grouping" as "something akin to 'the lion and the lamb.'" Hearings before Senate Judiciary Committee, June 23, 1977, p 4, tape 49, side 1.

On the House floor, Representative Frohnmayer stated that the bill aimed to codify an area that had been unclear, and that the bill represented a compromise between the Oregon Medical Association and the Oregon Trial Lawyers Association, with OMA getting "less uncertainty" and OTLA getting "increased patient rights." Third Reading of HB 3014, House Floor, June 15, 1977, tape 29, side 1.

■ ■    Turning to the record in the case at bar, there is evidence — and the jury could have found — that defendant failed to ask plaintiff if she wanted a more detailed explanation and that defendant, therefore, was required to make the detailed disclosures listed in the second sentence of ORS 677.097(2). The next question is whether there is evidence that defendant failed to disclose "in substantial detail the procedure, the viable alternatives and the material risks."[5] ORS 677.097(2). There was evidence that there were available nonsurgical methods of treatment other than those discussed by Dr. Petty. Three physicians testified that defendant's failure to tell plaintiff about these alternative treatments was below the standard of care. The jury could have found that defendant failed to "disclose in substantial detail * * * the viable alternatives and the materials risks." There also was evidence from which the jury could have found that plaintiff would not have consented to the surgery, had she been advised of the alternative methods of treatment.[6] Considering all the evidence in the light most favorable to the party in whose favor the verdict was returned (plaintiff), there was sufficient evidence to go to the jury on the informed consent claim.[7] The Court of Appeals erred in reversing the judgment on account of the informed consent issue.

Other issues remain, however. In the response to the petition for review, defendant asserts that the trial court erred in other rulings. We turn to those issues.

■    Defendant asserts that the trial court should not have submitted to the jury the claims that defendant was negligent in recommending and performing the surgery to correct or control plaintiff's hormonal imbalance. The Court of Appeals discussed this issue as follows:

"[D]efendant argues that there was no evidence that he recommended or performed a total hysterectomy for the

---

[5] Defendant does not assert that such a detailed discussion with plaintiff would have been "materially detrimental" to her. ORS 677.097(2).

[6]

"The failure properly to obtain the patient's consent 'causes' the alleged harm if after a proper explanation the patient would not have consented to the procedure * * *." *Arena v. Gingrich*, 305 Or 1, 4, 748 P2d 547 (1988).

[7] No party argues that the jury was wrongly instructed.

primary purpose of correcting or controlling plaintiff's hormonal imbalance. His position is that the primary reason for the surgery was relief of the pain. He contends that there was no evidence that it would have been negligent for him to consider the hormonal problems in addition to the pain when recommending and performing surgery. He claims that, because no one testified that he would have performed a TAH/BSO had there not been pelvic pain, the allegations were unsupported by any evidence.

"Plaintiff argues that neither of the allegations asserts that defendant was negligent in recommending and performing the surgery 'solely' or even 'primarily' for correction and control of hormonal imbalance. Her contention is that hormonal imbalance should not have played any part in the surgical decision, alone or in combination with other reasons, and that she submitted evidence that it was done for that reason, which was conduct below the standard of care.

"Defendant's reason for performing the TAH/BSO was a question of fact for the jury to determine. He testified that it was only done for plaintiff's pelvic pain. He claims that her pain and her hormonal imbalance were two different conditions and that he operated and performed a total hysterectomy to resolve her pain. Plaintiff's medical records, however, contained evidence to the contrary. The history and physical examination record made by defendant before surgery indicated that her problems were pelvic pain, constipation and PCOD [polycystic ovarian disease] with increasing hirsutism. The records also indicated that [Dr.] Cook thought that removal of her fallopian tubes and ovaries would be useful to control the hirsutism. The records also contain defendant's own impressions of plaintiff's problems as possibly secondary to PCOD, that endometriosis was the etiology of her chronic pelvic pain, that an exploratory laparotomy was necessary and that a TAH/BSO was the probable surgical treatment.

"On plaintiff's admission to the hospital, defendant recorded his admission diagnosis as chronic pelvic pain and increasing hirsutism. The post-surgery pathology report indicated that defendant's pre-operative diagnosis was hirsutism and a possible androgenizing ovarian tumor. Additionally, Cook, who consulted with defendant before surgery, later recorded that plaintiff had had a TAH/BSO for PCOD. In addition, two medical experts gave their opinions, on the basis of those records, that the surgery was performed to correct plaintiff's hormonal imbalance. With that evidence,

the jury could have disbelieved defendant and could have concluded that he removed her reproductive organs to control her hormonal imbalance. If it had concluded that, the jury could have then concluded that he had breached the standard of care." *Zacher v. Petty, supra,* 103 Or App at 16-17.

We agree with the Court of Appeals' analysis on this issue.

■     Defendant also asserts that there was no evidence to support plaintiff's allegation that defendant was negligent in performing a laparotomy, when he knew or should have known that a laparoscopy was a more appropriate surgical procedure.[8] One of plaintiff's expert witnesses testified:

"Q.   Dr. Vaitukaitis, do you have an opinion as to whether or not Dr. Petty breached the standard of care in performing a total abdominal hysterectomy and bilateral salpingo-oophorectomy on Carroll Zacher?

"A.   Yes.

"Q.   And what is your opinion?

"A.   My opinion is that based on the operative description of Dr. Petty there was no significant pathology described, gross pathology, prior to his undertaking the — undertaking the hysterectomy and bilateral salpingo-oophorectomy.

"Q.   And what diagnostic tests in your opinion should have been undertaken?

"A.   In my opinion Dr. Petty should have initially undertaken a laparoscopy to try to ascertain whether there was any significant intra-abdominal pathology or pelvic pathology.

"Q.   And if he had done so, what information do you believe that a laparoscopy would have revealed?

"A.   For practice [*sic*] purposes the same findings as in 1977, at the time of laparoscopy, except that the sclerocystic ovaries would not have been apparent, because with the prolonged oral contraceptive therapy the ovarian capsule was not markedly thickened."

_____

[8] A laparoscopy is less invasive than a laparotomy. The Court of Appeals described a laparoscopy as "an operation that allows a visualization and examination of the abdominal cavity by the insertion of an instrument through a small incision just below the navel." *Zacher v. Petty,* 103 Or App 8, 10 n 2, 797 P2d 1042 (1990). The court stated that a laparotomy is "exploratory abdominal surgery." *Id.* at 11.

The Court of Appeals concluded, and we agree, that there was sufficient evidence to submit this claim to the jury. The jury could find, on the basis of that testimony, that had defendant performed a laparoscopy, he would not have recommended and performed the more radical surgery.

■　　　Defendant also argues that the trial court erred in overruling his objections to the filing of a Sixth Amended Complaint during trial. The amendments were permissible under ORCP 23B.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.